IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA　　　　:　　CRIMINAL ACTION
　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
KAMAAL MALLORY　　　　　　　　:　　NO. 12-379


MEMORANDUM

McLaughlin, J.　　　　　　　　　　　　　　March 11, 2013

　　　　　The defendant, Kamaal Mallory, has been indicted on one
count of possession of a firearm by a convicted felon in
violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  This charge
arises from the defendant's alleged possession of a Smith &
Wesson, Model 10 .38 caliber revolver during the early morning
hours of January 15, 2012.  The defendant has moved to suppress
the Smith & Wesson .38 caliber revolver recovered from his
stepmother's home on that day.  The Court held an evidentiary
hearing on the defendant's motion on January 7, 2013.  After
receiving supplemental briefing from the parties, the Court will
grant the motion.


I.　　Findings of Fact

　　　　　The following represent the Court's findings of fact
based on its assessment of the evidence presented at the
January 7 evidentiary hearing, including its evaluation of the
credibility of the testifying witnesses.  At that hearing, the
Government presented only one witness: Police Officer Richard

Hough.  Five witnesses testified for the defense: (1) Ismail Abu Bakr, the defendant's brother; (2) Richard Thomas, III, the defendant's friend; (3) Delaine Abu Bakr, the defendant's stepmother; (4) Siddiqah Abu Bakr, one of the defendant's sisters; (5) Tazkeyah Abu Bakr, another of the defendant's sisters.

### A.    Police First Arrive at 3400 Block of Old York Road

On Saturday, January 14, 2012, the defendant, Kamaal Mallory, and his brother, Ismail Abu Bakr, were working together as emergency medical technicians for a company identified as Northwest Care Ambulance.  Later that evening, after work, Mallory, Ismail,[1] and at least two of their friends, Richard Thomas, III and Nur Hasan, met at the home of Ismail's mother, also Mallory's stepmother, located at 3434 Old York Road in Philadelphia.  Although Mallory does not live at his stepmother's home full-time, he and his two daughters stay at her home on the weekends and were spending the weekend of January 13-15 at her residence.  I. Abu Bakr Test. at 44-47;[2] D. Abu Bakr Test. at 89-90.

---

[1] Because many of the individuals involved in the events at issue are Mallory's family members and share the common last name Abu Bakr, the Court will refer to them by their first names for the sake of clarity.

[2] All testimony is taken from the evidentiary hearing held before the Court on January 7, 2013.

Sometime between 1:45 a.m. and approximately 2:30 a.m. on January 15, Mallory, Ismail, and their friends were standing on Old York Road in front of a neighbor's house. I. Abu Bakr Test. at 65-66; Gov't Ex. 1. A police cruiser pulled up near where they were standing, and Officer Eric Enders, one of the officers inside the car, asked them whether they lived in that house. Ismail responded that they did not, and Officer Enders instructed the men to leave the area in front of the house. Mallory, Ismail, and their friends began walking toward Mallory's stepmother's house. As they did so, Officer Enders began flashing a light on them. Ismail cursed at the officer and told him to stop shining the light on them, at which point Officer Enders got out of the police car and grabbed Ismail while he was standing on the sidewalk in front of his mother's home. Officer Enders wound up handcuffing Ismail and placing him in the back seat of his police vehicle. Officer Enders informed Ismail that he was being detained for disorderly conduct. The officers then drove the car in which Ismail had been placed around the corner and parked. I. Abu Bakr Test. at 48-50.

As Ismail was engaged in the verbal exchange with Officer Enders or shortly before the exchange began, Mallory went back to his stepmother's house and knocked on the door. His sister, Siddiqah Abu Bakr, answered. When Siddiqah opened the door to let Mallory in, she saw flashing lights from the police

-3-

patrol car. She then closed the door and peered out the window. She saw Ismail and some friends standing on the sidewalk and saw that Ismail was speaking with an officer. She then saw the officer turn Ismail around. Siddiqah asked Mallory if she should get her mother, Mallory's stepmother, Delaine Abu Bakr, and Mallory responded that she should fetch Delaine. S. Abu Bakr Test. at 107-08.

Siddiqah went upstairs to Delaine's bedroom, where Delaine was sleeping. Siddiqah told Delaine that Ismail was about to be arrested and that Delaine needed to get up. Siddiqah then went back to the first floor and saw Ismail being put into the back of a police car and watched the vehicle drive away. By the time Delaine came downstairs, the police car had already driven out of sight. Id. at 109; D. Abu Bakr Test. at 90-91.

After driving around the corner and parking, Officer Enders and his partner waited with Ismail in that location for several minutes. One of the officers then let Ismail out of the cruiser and removed his handcuffs. The officer got back into the vehicle and it drove off. Ismail then walked back around the corner toward his mother's house, where he saw a group of friends and family members on the porch and two police cruisers parked out front. I. Abu Bakr Test. at 50-51.

B.    <u>Officers Enter 3434 Old York Road</u>

Officer Richard Hough is a police officer with the Philadelphia Police Department and has been a police officer for six and a half years.  In the early morning hours of January 15, 2012, Officer Hough and his partner, Officer William Lynch, Jr., were working a shift that had begun at 8:00 p.m. on January 14 and was set to end at 4:00 a.m.  At 2:33 a.m., Officers Hough and Lynch received a radio dispatch that there was a group of men standing on the street on the 3400 block of Old York Road and that one of them, a black male wearing a brown leather jacket and black hooded sweatshirt, was armed.  Hough Test. at 5-8; Gov't Ex. 1.

At the time they received the radio dispatch, Officers Hough and Lynch were in their vehicle about 25 city blocks away in the area of G Street and Allegheny Avenue.  Officer Lynch was driving.  Upon receiving the radio transmission, Officers Lynch and Hough drove to the 3400 block of Old York Road, arriving there about five minutes later.  Hough Test. at 9, 15.

Officers Lynch and Hough pulled up to 3434 Old York Road in the northbound lane on the east side of the street.  Id. at 9.  Delaine, who had been standing on the porch of her home, saw the police car coming down the street.  She walked down the steps from her porch to the sidewalk and then out into the street, approaching the driver's side of the police car.  D. Abu

Bakr Test. at 92; S. Abu Bakr Test. at 110; Hough Test. at 9, 16-17.  Delaine asked the officers whether they had arrested her son, referring to Ismail.  D. Abu Bakr Test. at 92.

While Delaine was speaking with the officers, Officer Hough observed a male, later identified as Mallory, standing behind her and to her left.[3]  He was wearing a brown leather jacket with a dark hooded sweatshirt underneath, which matched the description in the flash report dispatched a few minutes earlier.[4]  Mallory said something to Delaine or the officers.  As he did so, his jacket lifted and Officer Hough observed the dark handle of a revolver sticking out of Mallory's waistband.  Officer Hough then stated to his partner, "gun," the normal method of identifying the presence of a weapon.  Officer Hough exited the vehicle and ordered Mallory to stop.  Mallory did not comply and instead ran into the house, shutting the door behind him.  Officer Hough ran toward the house, with Officer Lynch

_____

[3] It is unclear whether Mallory was standing near Delaine on the street or sidewalk or if Mallory was further back, on the porch of his stepmother's house.  Officer Hough testified that Mallory was standing approximately two feet behind Delaine.  Hough Test. at 17.  Other witnesses recall that Mallory was on the porch when Officers Hough and Lynch arrived and that he did not at any time step down from the porch onto the sidewalk or street.  D. Abu Bakr Test. at 105; Thomas Test. at 83; S. Abu Bakr Test. at 110-11, 118.

[4] Officer Hough remembers the sweatshirt being black.  Hough Test. at 9-10.  Siddiqah testified that Mallory was wearing a navy blue sweatshirt, but otherwise confirms Officer Hough's description of what Mallory was wearing that night.  S. Abu Bakr Test. at 118.

following.  At that time, Officer Hough did not know whose home Mallory was entering.  Hough Test. at 9-10, 13, 17, 19-20, 26. As the officers ran from their vehicle to the house, their hands were on their guns.  D. Abu Bakr Test. at 101.

Siddiqah went toward the front door and attempted for a few seconds to block the officers from entering the house.  She yelled at the officers that they had no right to enter because they did not have a warrant.  Officers Hough and Lynch mounted the steps to the porch and one of them pushed Siddiqah aside.  S. Abu Bakr Test. at 112.  Officer Hough then kicked the front door once, breaking its latch.  He felt someone pushing the door shut from inside the house, however, and assumed it was Mallory who was preventing his entrance.  Officer Hough then repeatedly kicked the door, which was made of several panels.  Officer Hough eventually kicked through a lower panel on the door.  He felt the pressure from the other side of the door release and was able to push the door open.  Hough Test. at 10-11.  The doorknob is on the right side of the door and, when facing the entryway, the door opens into the house and to the left.[5]  I. Abu Bakr Test. at

---

[5] At the evidentiary hearing, Officer Hough testified that he saw, through the hole he had made in the front door, Mallory place his handgun behind an umbrella on the left side of the foyer and directly behind the door.  Hough Test. at 10-11.  The Court does not find this testimony credible for several reasons, most of which will be addressed later in the Court's findings of fact.  First, Ismail testified that the lower right panel of the front door was broken, but was not completely removed.  It seems unlikely that Officer Hough would have been able to observe activity behind the door and to its left given the obstructed

54, 60.

While Officer Hough was kicking open the door to the house, Officer Lynch called for backup. Upon entering the home with Officer Lynch, Officer Hough observed that the first floor was completely dark. Hough Test. at 11-12, 29. Siddiqah and Delaine followed Officers Hough and Lynch into the house, and Siddiqah began screaming and crying. The officers told her to shut up and told her and Delaine to get out of the house. At that point, another of Mallory's sisters, Tazkeyah Abu Bakr, started coming down the stairs from the second floor to the first floor of the house. One of the officers pointed his gun at Tazkeyah's face and told her to get off of the stairs and get out

_____

nature of his view and the angle afforded him from his standing position. Officer Hough did not testify that he crouched down to peer through the hole or otherwise changed his vantage point to observe what was going on inside the house. Second, Officer Hough testified that, when he entered the residence at 3434 Old York Road, the entire first floor was dark, making it less likely that he could see Mallory's actions on the other side of the door. Third, during a subsequent search of the home, Officer Hough never told his fellow officers where the gun was located, nor did he take steps to secure the weapon. Fourth, Mallory's siblings testified that, after the officers had completed their search, they noticed that drawers had been opened and clothing had been thrown on the ground, suggesting that the officers were searching for a weapon, and not just Mallory. Fifth, on their way out of the residence, an officer either asked whether any of the other officers had checked behind the front door or directed the other officers to check behind the door. This is inconsistent with the claim that Officer Hough knew the gun had been stashed behind the front door. Sixth, Officer Hough testified that he did not retrieve the gun before that point because the Police Department's detective division had issued a policy directing officers to leave firearms in place so that they could be photographed as found. No photographs of the gun were taken that night. Id. at 22-24.

of the house. Delaine, Siddiqah, and Tazkeyah then left the house and waited on the front porch. S. Abu Bakr Test. at 112-13; D. Abu Bakr Test. at 94; T. Abu Bakr Test. at 125-26; Hough Test. at 20.

Once the women had exited the home, Officers Hough and Lynch waited in the first floor living room, located directly next to the foyer, for backup to arrive before beginning a search of the house. Officer Hough did not inform Officer Lynch where he thought Mallory's gun was located. Hough Test. at 12, 20, 29-30.

C. Officers Search 3434 Old York Road

In a matter of seconds, Officers Kevin Gorman and Kevin Robinson arrived on the scene in response to Officer Lynch's request for backup. Officer Hough directed them to wait on the first floor, with one stationed near the front door of the house. He also directed them not to let anyone inside the house. He did not tell either of the backup officers where he believed Mallory had placed the gun that he had previously seen in his waistband. Id. at 12, 20, 30-31, 35-36.

Officers Hough and Lynch then searched the four-story home for Mallory. They started on the top floor of the house and worked their way down. Officers Hough and Lynch searched areas where someone could hide, including closets, rooms, and spaces

under beds.  Id. at 11, 14.  They also searched areas small
enough to hide Mallory's weapon, but not Mallory.  After the
police had left, Mallory's siblings surveyed the house and
noticed that drawers in certain rooms had been opened, clothes
were strewn "everywhere," and a pillow had been flipped over.  I.
Abu Bakr Test. at 59; S. Abu Bakr Test. at 117; T. Abu Bakr Test.
at 128.

     While the police were searching the home, Ismail
returned.  He noticed that the lower right panel of the front
door had been broken but was not completely dislodged.  It was
still hanging from the door.  Ismail entered his mother's home
and encountered one officer standing by the first-floor kitchen
and another officer coming down the stairs leading to the first
floor.  Ismail began arguing with the officer descending from the
second floor.  Delaine came into the house and brought Ismail
outside to join the other friends and family members, who were
waiting on the porch.  I. Abu Bakr Test. at 53-57.  Richard
Thomas, Ismail's friend, attempted to calm Ismail down.  Thomas
Test. at 76.

     It was then that Sergeant Marc Hayes, a supervising
officer, arrived and spoke with Delaine.[6]  She explained that the

_____

    [6] It is possible, although not clear, that other officers
also arrived at 3434 Old York Road to provide backup.  Ismail
testified at the evidentiary hearing that he saw Officer Enders
and his partner in his mother's house after being released from
their vehicle.  I. Abu Bakr Test. at 56.  Delaine's testimony
also suggests that two backup units entered her house.  D. Abu

officers in the house had asked everyone to wait outside but that it was cold out that night. Sergeant Hayes then permitted Mallory's family members and friends to come back into the house and wait in the living room on the first floor. D. Abu Bakr Test. at 95; I. Abu Bakr Test. at 57.

After searching the upper floors, Officer Hough returned to the first floor and encountered Sergeant Hayes. Officer Hough saw that some of the house's occupants, previously ordered out of the house, were now back in the home and in the living room. Officer Hough explained to Sergeant Hayes that he did not want any non-officers in the house because he had not yet recovered the firearm he had earlier seen on Mallory's person. Officer Hough did not, however, tell Sergeant Hayes where he thought the gun was located. Given Officer Hough's concerns, the officers sent Mallory's friends and family members back outside to wait on the porch.[7]  Hough Test. at 21-22, 32-33.

_____

Bakr Test. at 94. A computer-aided dispatch report, submitted by the Government as an exhibit, also reflects that, in addition to Officers Gorman and Robinson, other officers sent radio transmissions responding to the call for backup. Gov't Ex. 1; Hough Test. at 34-42. At the very least, five officers were at Delaine's house on January 15: Sergeant Hayes and Officers Hough, Lynch, Gorman, and Robinson.

[7] There is some confusion in the witnesses' testimony as to whether any of Mallory's friends and family members yet again entered the house that night while the officers were conducting their search for Mallory and without the officers' permission. Officer Hough's testimony suggests that the friends and family remained on the porch for the duration of the officers' search. Hough Test. at 22, 32-33.

As the officers were searching the first floor of the home, they located a door in the back of the house. Officer Hough first thought it was an exterior door leading outside. After peering out a back window, Officer Hough realized that the door led to a bathroom addition built onto the house. He was over 90% sure that Mallory was hiding in that bathroom. Officer Hough tried to open the bathroom door, but it was locked. He and Officer Lynch went out to the front porch and asked Delaine to come inside and assist in getting Mallory out of the bathroom. They wanted to see if Delaine had a key to the bathroom or if she could coax Mallory out voluntarily before they resorted to breaking down the bathroom door. Officer Hough asked Delaine whether the door was usually locked. She stated that it was not and that she did not have a key. Officer Hough then asked Delaine to ask Mallory to come out of the bathroom. No response came from within the bathroom. Id. at 11, 32-34.

The officers then used a small crowbar to pry the door open and found Mallory in the bathroom. The officers arrested and handcuffed Mallory and began leading him out of the house. Id. at 11-12; D. Abu Bakr Test. at 96; I. Abu Bakr Test. at 67.

As the officers led Mallory from the rear of the home toward the front door, one of them either asked whether his fellow officers had checked behind the front door or directed the other officers to check behind the front door. Ismail testified

that one of the officers "asked did anybody check back there behind that door." I. Abu Bakr Test. at 67. Mallory's sisters, Siddiqah and Tazkeyah, recall hearing one of the officers say, "check behind the door." S. Abu Bakr Test. at 116, 123; T. Abu Bakr Test. at 128.

Officer Hough then recovered a revolver from under or behind umbrellas located on the left side of the foyer behind the front door, which had been swung open into the house. Hough Test. at 12-13; <u>see also</u> I. Abu Bakr Test. at 60-61, 67; S. Abu Bakr Test. at 116. The gun was registered to Delaine. D. Abu Bakr Test. at 98, 104.

## II. <u>Analysis</u>

Mallory has moved to suppress the gun retrieved from the foyer of his stepmother's home, raising several Fourth Amendment claims. Mallory contends that the officers' warrantless entry into that residence was based on neither probable cause nor exigent circumstances. He further argues that any exigencies justifying the officers' initial entry and home search had dissipated by the time he was handcuffed and being led out of the house, precluding the officers from then looking behind the front door for the gun. The government disputes each of Mallory's arguments, and maintains that, assuming some aspect of the search for and retrieval of the gun was unlawful, the gun

should not be suppressed based on the inevitable discovery doctrine.

The Court finds that the officers' warrantless entry into the residence at 3434 Old York Road and their initial search of those premises was justified by the exigencies of the situation. Those exigencies had, however, ended by the time the officers reduced Mallory to custody and were exiting the home with him. Officer Hough was not at that point permitted to search for and seize from behind the front door the .38 caliber Smith & Wesson handgun. Because the government cannot avail itself of the inevitable discovery doctrine to avoid exclusion of this evidence, the gun must be suppressed.

A.   Exigent Circumstances

As a general rule, the Fourth Amendment requires law enforcement officials to obtain a warrant before entering a private home and conducting a clearly defined search or seizure once inside. Kentucky v. King, 131 S. Ct. 1849, 1856 (2011); Payton v. New York, 445 U.S. 573, 590 (1980). That requirement is obviated where the exigencies of the situation are so compelling that law enforcement is objectively reasonable in effectuating a warrantless search or arrest in the home. King, 131 S. Ct. at 1856; Welsh v. Wisconsin, 466 U.S. 740, 749 (1984). Even when emergent circumstances permit officers to forego

procuring a warrant, the officers' entry and any ensuing search must still be supported by probable cause to believe that criminal activity has occurred.  <u>Welsh</u>, 466 U.S. at 749; <u>Couden v. Duffy</u>, 446 F.3d 483, 496 (3d Cir. 2006).

    1.   <u>Standing</u>

       The government raises a threshold objection to Mallory's Fourth Amendment claims, namely, that Mallory lacks standing to challenge any entry into or search of his stepmother's home.  To assert a Fourth Amendment claim, an individual must demonstrate that "'he had a legitimate expectation of privacy in [the place searched].'"  <u>United States v. Stearn</u>, 597 F.3d 540, 551 (3d Cir. 2010) (quoting <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 104 (1980)) (alteration in original).

       Mallory does not live in his stepmother's house full-time.  He and his two daughters stay at that residence on the weekends, however, and were staying there the night the officers' entry and search took place.  That is sufficient to establish Mallory's legitimate expectation of privacy in the residence and to defeat the government's standing argument.  <u>See</u> <u>Minnesota v. Olson</u>, 495 U.S. 91, 96-97 (1990) ("[S]tatus as an overnight guest is alone enough to show . . . an expectation of privacy in the home that society is prepared to recognize as reasonable.").

2. <u>Probable Cause</u>

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." <u>United States v. Myers</u>, 308 F.3d 251, 255 (3d Cir. 2002) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)). Of relevance here, Pennsylvania law makes it a crime to carry a firearm "upon the public streets" in the City of Philadelphia. 18 Pa. Cons. Stat. Ann. § 6108; <u>see also</u> <u>United States v. Bond</u>, 173 F. App'x 144, 146 (3d Cir. 2006).

A little after 2:30 a.m. on January 15, 2012, Officers Hough and Lynch responded to a flash report that a black male wearing a brown leather jacket and dark hooded sweatshirt, in the company of others, was carrying a gun on the street of the 3400 block of Old York Road. When they arrived on that block in their police vehicle, they observed Mallory, who matched that description, standing either on the front porch of 3434 Old York Road or the sidewalk directly in front of that address. Hough then observed a gun in Mallory's waistband. Hough exited his vehicle and told Mallory to stop, but Mallory instead ran into the home behind him. The totality of these circumstances sustain a finding of probable cause that Mallory had violated the law against carrying a firearm on the streets of Philadelphia.

Of course, as Mallory notes, flight from the police does not automatically establish probable cause. United States v. Navedo, 694 F.3d 463, 471 (3d Cir. 2012). When combined with other indicia of criminal activity, however, flight may be considered as a factor weighing in favor of a probable cause determination. Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000); United States v. Laville, 480 F.3d 187, 195 (3d Cir. 2007). The Third Circuit has read the Supreme Court's opinion in Wardlow as adding the following facts to arrive at probable cause: (1) the defendant's presence in a high crime area, plus (2) the defendant's flight from law enforcement, plus (3) the officers' discovery, during a frisk, of what felt like a weapon. Navedo, 694 F.3d at 471. The facts here are similar. First, although there is no evidence that Mallory was observed in a high crime area, he did match the description of someone who had committed an offense under Pennsylvania law. Second, Officer Hough directly observed, rather than felt, a gun in Mallory's waistband. Third, Mallory fled from the officers.

Mallory suggests that probable cause was lacking because the suspect description in the flash report to which Hough and Lynch responded was provided by an anonymous tipster, which is less reliable than a tip by a known informant. See Florida v. J.L., 529 U.S. 266, 270 (2000); United States v. Torres, 534 F.3d 207, 210-11 (3d Cir. 2008). Before an anonymous

-17-

tip permits even a reasonable suspicion of criminal activity, a lower quantum of proof than probable cause, there generally must be corroborative information.  J.L., 529 U.S. at 270.  Hough's observation of a gun in Mallory's waistband provided the necessary corroboration.  The officers did not pursue Mallory based only on an anonymous tip.

### 3.  Exigencies Justifying Initial Entry and Search

It has long been held that "hot pursuit of a fleeing suspect" constitutes an exigent circumstance that justifies infringement of the traditional right to privacy in one's home. King, 131 S. Ct. at 1856 (citing United States v. Santana, 427 U.S. 38, 42-43 (1976)).  Where probable cause exists, a suspect's retreat into a dwelling cannot thwart an otherwise proper arrest. Santana, 427 U.S. at 42-43.

After Officer Hough saw that Mallory was in possession of a firearm and ordered him to halt, Mallory ran into the house located at 3434 Old York Road.  There is nothing to suggest the officers knew who else might be inside the residence and who might be placed in danger by Mallory's presence.  At the time, Hough did not even know whether the home belonged to Mallory or any of his family members.  Faced with facts establishing probable cause, the officers were entitled to follow Mallory into the house in hot pursuit.

The question then becomes the scope of any search the officers were permitted to perform following their entry. The Supreme Court has stated that exigent circumstances, although dispensing with the need for a warrant, do not justify limitless searches. Any such "warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" Mincey v. Arizona, 437 U.S. 385, 393 (1978) (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)). "[E]xceptions to the warrant requirement are few in number and carefully delineated," and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh, 466 U.S. at 749-50 (quotation marks and citation omitted).

In Warden, Maryland Penitentiary v. Hayden, the Supreme Court described the scope of a warrantless "hot pursuit" search. In Hayden, police officers received information that, minutes earlier, a suspected armed robber had fled the scene of the crime and entered a nearby residence. 387 U.S. 294, 297 (1967). The officers entered the home, split up, and conducted a thorough search of the premises for the suspect, any possible confederates, and "weapons which he had used in the robbery or might use against them." Id. at 298-99. During the search, the officers found and arrested the suspect. "[P]rior to or immediately contemporaneous with [the suspect's] arrest," the officers also uncovered, at various locations throughout the

home, a shotgun and pistol in the flush tank of a toilet, a clip of ammunition and a cap under the mattress of the suspect's bed, and, located in a washing machine, the clothing the suspect had worn during the robbery.  Id.

It is clear from Hayden, that a warrantless home search premised on hot pursuit of a fleeing suspect permits the police to search for the suspect, weapons that could be used against law enforcement or to effect an escape, and other persons in the residence who might pose a danger to the searching officers. Id.; see also Illinois v. McArthur, 531 U.S. 326, 331 (2001) (citing Hayden for the following proposition: "warrantless search for suspect and weapons reasonable where delay posed grave danger").  These objectives are tied closely to the exigency justifying the search, i.e., the dangers posed by a fleeing suspect who, pursued and possibly cornered, may attempt to evade capture or lash out at law enforcement or innocent members of the public.

Under Hayden, Officers Hough and Lynch were entitled to search the home into which Mallory ran for both Mallory and the weapon they had seen in his possession.  There was nothing improper about those officers opening drawers, flipping over a pillow, and searching other areas throughout the house into which Mallory could have secreted his gun.

B.    Dissipation of Exigencies

Because a warrantless home search must be conducted in a manner designed to meet the dangers that justified its initiation, the search cannot continue after those dangers have subsided.  See, e.g., Mincey, 437 U.S. at 392-93; United States v. Murphy, 516 F.3d 1117, 1121 (9th Cir. 2008).  "[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." Murphy, 516 F.3d at 1121.  Mallory contends that any exigencies supporting the officers' initial entry and search had ebbed by the time Officer Hough looked behind the front door and under an umbrella, where he found the gun.  By that point, the home had been searched, Mallory was in handcuffs and under police control, and his friends and family members, save his stepmother, were outside the home on the front porch.

Evaluating whether exigent circumstances remained and permitted Hough's search is a largely fact-dependent inquiry. The Court does, however, draw guidance from several cases.

In Hayden, the Supreme Court declared lawful the seizure of various weapons and evidence from locations throughout the house into which a fleeing armed robbery suspect had run.  Of relevance to the Court was the fact that "the seizures occurred prior to or immediately contemporaneous with [the defendant's]

arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run."  387 U.S. at 299.

United States v. Ford, a D.C. Circuit case, offers a helpful contrast with Hayden.  In Ford, six law enforcement officers entered, pursuant to an arrest warrant, an apartment owned by the suspect's mother; witnessed the suspect, Ford, emerge from a bedroom into an adjoining hallway; and placed him under arrest, handcuffing him in the hallway and leaving him in the custody of some of the officers.  56 F.3d 265, 266-67 (D.C. Cir. 1995).  A federal agent then went into the bedroom from which Ford had emerged and searched under the mattress and behind the window shades.  Id. at 267.  That search uncovered a handgun, ammunition, money, and crack cocaine.  Id.  The D.C. Circuit rejected the government's argument that the search could be predicated on exigent circumstances.  The court found that Ford was not, in fact, fleeing from the officers and the search occurred after he had been arrested and all persons in the apartment had been secured.[8]  Id. at 271.

In United States v. Goree, another case decided by the D.C. Circuit, officers entered an apartment without a warrant in response to a report of domestic violence.  365 F.3d 1086, 1087 (D.C. Cir. 2004).  Once inside, the officers observed Goree and his girlfriend, Lemons.  Id. at 1088.  Goree began approaching

---

[8] The court in Ford did not specify who, if anyone, had also been in the apartment.

the officers and did not stop when they ordered him to do so.
Id. Lemons also was, by her own admission, hostile to the
officers' presence. Id. at 1091-92. One of the officers then
grabbed Goree's hands, handcuffed him, and directed him to sit on
a chair in the apartment's dining room area, an order that Goree
physically and orally resisted. Id. at 1088. The officer
finally walked Goree into the dining room, where he saw a loaded
ammunition clip on the dining room table. Id. The officer
assumed that the apartment also contained the corresponding
weapon, so his partner walked into the kitchen adjacent to the
dining room area and found a semiautomatic pistol on top of the
refrigerator. Id.

The D.C. Circuit examined whether the officer's search
of the area above the refrigerator was both justified by exigent
circumstances and no broader than the exigencies dictated. The
court determined that several factors militated in favor of
permitting the search. Of paramount concern, there was the
danger that Goree or Lemons, both participants in a volatile
domestic disturbance then in progress, might use a firearm on
each other or the police, especially given their expressed
resistance to the officers. Id. at 1091-92. Although Goree was
handcuffed, he was not immobilized, diminishing, though not
eliminating, the possibility that he could get free. Id.
Indeed, it is not clear from the opinion if more than one officer

remained with Goree in the dining room; at the very least, he had
not yet been arrested when the kitchen was searched.  Id. at
1088.  There also were only two officers initially on scene to
control the situation, though two more later arrived.  Id. at
1093.

The D.C. Circuit concluded that it could not determine,
based on the record, whether the present exigencies permitted a
search of the area above the refrigerator, and remanded for
further factual development.  Of critical importance to the D.C.
Circuit was determining (1) whether Lemons was "moving freely
about," as the government contended, or was being supervised and
moved around the apartment by the officers; (2) how well Goree
was secured; (3) whether the gun was plainly visible upon entry
to the kitchen; (4) how far the kitchen entrance and refrigerator
were from where Goree was in the dining room; and (5) whether the
path from the dining room to the refrigerator was obstructed or
clear.  Id. at 1094 (quotation marks omitted).

Finally, the Court looks to the First Circuit's
decision in United States v. Lopez, to which Goree cites.  In
that case, officers arrived at a "decrepit" apartment building in
response to a call that an individual had been threatened by
someone holding a sawed-off shotgun.  Lopez, 989 F.2d 24, 25 (1st
Cir. 1993).  Upon arriving at the building, one of the officers
observed the defendant, who fit the caller's description and was

-24-

holding an object, in the yard outside.  The officer called on the defendant to halt, watched the defendant run into the building, and gave chase up to the second floor, followed by other officers.  Id.  The officers arrested and handcuffed the defendant and then searched for the shotgun, finding it a few minutes later in an adjoining bathroom.  Id.  The officer who retrieved the shotgun saw a ceiling tile missing in the bathroom, stood on the toilet to peer into the hole, and saw the butt of the gun.  Id.  The ceiling then gave way and a shotgun tumbled to the floor.  Id.

The First Circuit upheld the warrantless search for the gun based on exigent circumstances.  The Lopez court relied on the fact that the police had reason to believe a dangerous weapon was located near the spot of arrest and had not yet done a protective sweep, leaving them without confirmation that the defendant had acted alone or that the apartment was secure.  Id. at 26-27.  The court also noted that the additional invasion of privacy posed by the search, "although not minimal, was limited." Id. at 27.  Tellingly, the First Circuit sounded a note of warning, "cautioning that [the] facts may press close to the outer limit of the Fourth Amendment."  Id.

Drawing on the facts and reasoning of Hayden and the other above-referenced cases, the Court concludes that Officer Hough's search behind the front door was not justified by exigent

circumstances.  Most importantly, Mallory had already been apprehended and handcuffed before Hough began looking for the gun.  That being so, Hough's search did not occur "prior to or immediately contemporaneous with [an] arrest, as part of an effort to find a suspected felon," as in Hayden.  Hayden, 387 U.S. at 299.  It occurred after the main objective of the officers' entry and search, capture of a fleeing suspect, had been fulfilled.  This case, therefore, is unlike Hayden and, in terms of the relative timing of arrest and search, more closely resembles Ford.  As in Ford, law enforcement embarked on a new search after the suspect, whose presence justified entry into the home in the first place, was already in police custody.  The search was not designed to meet the initiating exigency.

Nothing about Mallory's own behavior undercuts this conclusion by suggesting that he posed a danger to law enforcement or that he might attempt escape.  Preliminarily, unlike the defendants in Hayden and Lopez, Mallory was not suspected of a violent offense in which a firearm was used against a third party.  Neither was he embroiled in a volatile, physical altercation with someone on the scene, as was the case in Goree.  The officers suspected Mallory of a possessory offense only.

Additionally, although Mallory did not voluntarily exit the bathroom in which he had been hiding, there is no evidence

that, once the bathroom door was pried open, he physically or orally resisted arrest. Nor is there any evidence of Mallory struggling against the officers once handcuffed. Someone in handcuffs may still pose a threat. United States v. Shakir, 616 F.3d 315, 320-21 (3d Cir. 2010). But, like the defendant in Ford, and unlike the defendant in Goree, Mallory was apprehended by at least two officers–Officers Hough and Lynch–as soon as he came out of the bathroom and appears to have been escorted from the rear of the home and out the front door by multiple law enforcement officials. See, e.g., D. Abu Bakr Test. at 96 ("They handcuffed him and took him out."); Thomas Test. at 77 ("[T]hey came . . . walking out with Kamaal."). At a minimum, five officers, and perhaps more, were on the scene to control Mallory, his exit from the home, and the other individuals present.

Beyond the presence of multiple officers, other factors contributed to block Mallory's access to the gun in the home's foyer. Mallory's handcuffs obviously restrained his movement. Moreover, the officer prompting Hough's search made a remark about checking "behind the door," suggesting that it had been swung open and was obscuring the portion of the foyer where the gun was located. The gun was also situated behind or under an umbrella in that space, creating an additional obstruction. Of further relevance, the gun's recovery from under or behind an umbrella demonstrates that the gun was not in plain view.

Officer Hough's continued search for the gun was at least as
intrusive as the officer's peek behind a window shade or under a
mattress in Ford.

Importantly, by the time Officer Hough decided to
"check behind the door," he and his partner had conducted a
thorough sweep of the premises and had determined that the house
did not contain any confederates who might aid Mallory in an
escape or acts of aggression.  That fact distinguishes this case
from Lopez, in which the First Circuit refused, "[b]y a close
margin," to suppress a gun recovered during a search that took
place after the suspect was in handcuffs and surrounded by
officers.  989 F.2d at 26.  In Lopez, whose facts "may press
close to the outer limit of the Fourth Amendment," the court
permitted the search on the basis of exigent circumstances.  Id.
at 27.  In part, the court found that prompt action was justified
because the officers had no way of knowing whether the suspect
had acted alone and whether he had allies located elsewhere in
the apartment.  Id. at 26-27.  Here, the officers could harbor no
such concerns, given their top-to-bottom search of the house and
the possessory nature of Mallory's offense.

The individuals that the officers case did encounter,
Mallory's friends and family members, did not present any threat
either.  It is true that one of Mallory's sisters initially
resisted the officers' entry into the family home and that his

brother argued with one of the searching officers.  The record
does not suggest that they, or anyone else, continued to display
hostility toward the officers as they conducted their search of
the first floor, during which they located Mallory and recovered
the gun.  According to Officer Hough, by that time, the residents
and friends present that night–with the exception of Delaine, who
the police had asked inside–were unobtrusively waiting on the
porch.  There is no indication that any of them was antagonizing
the officers or impeding their search.  Indeed, Delaine was
actively aiding the police by attempting to coax Mallory from his
hiding place in the bathroom.  By all accounts, the five officers
had adequate control and supervision over all people present.

This also disposes of the government's argument that
the search was necessary to prevent the destruction of evidence.
The Fourth Amendment permits officers to conduct a warrantless
search where they "reasonably conclude that the evidence will be
destroyed or removed before they can secure a search warrant."
United States v. King, 604 F.3d 125, 147 (3d Cir. 2010)
(quotation marks and citation omitted).  Here, speed was not
essential.  Mallory was in custody and anyone else who could have
destroyed or hidden the gun was under police supervision.  Enough
officers were present to secure the premises while a warrant
could be obtained, and both parties agree that the officers would
have been entitled to hold at bay the home's residents while a

warrant application was made and until it could be procured.  See
McArthur, 531 U.S. 326; Ford, 56 F.3d at 272.  Alternatively, the
officers could have, of course, requested permission from Delaine
or any other resident for consent to search the premises.  See
Georgia v. Randolph, 547 U.S. 103, 109 (2006).  Either course of
conduct would have been sufficient to prevent the destruction of
evidence.

In sum, any exigencies surrounding the officers'
pursuit of a fleeing suspect had subsided by the time Officer
Hough conducted a further search behind the door for a gun.  The
officers were not required to retreat from the premises once
Mallory was reduced to custody and was being led from the house,
but they could not simply renew their warrantless search.


C.    Inevitable Discovery

In Nix v. Williams, the Supreme Court adopted the
inevitable discovery doctrine, which permits admission of
illegally obtained evidence where "the prosecution can establish
by a preponderance of the evidence that the information
ultimately or inevitably would have been discovered by lawful
means."  467 U.S. 431, 444 (1984).  In that scenario, the
deterrence rationale for excluding the evidence falls away.  Id.
The Third Circuit has stated that the government may meet its
burden by "establish[ing] that the police, following routine

procedures, would inevitably have uncovered the evidence."
United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir.
1998). "Inevitable discovery is not an exception to be invoked
casually." Id. at 196 (quotation marks and citation omitted). A
court assessing the government's inevitable discovery argument
must focus on "historical facts capable of ready verification,
and not speculation." Id. at 195 (citing Nix, 467 U.S. at 444
n.5).

The government argues that, even if the officers
exceeded the lawful bounds of a search premised on exigent
circumstances, the inevitable discovery doctrine makes
suppression of the gun unnecessary in this case. The
government's argument proceeds as follows: having failed to
recover the gun by the time Mallory was arrested, but well aware
that the gun likely remained within the residence, the officers
would have been remiss by leaving the firearm unsecured. The
only option available to them was to obtain a search warrant
permitting them to look for the gun, which they would have done.
Under the circumstances, a warrant would have been readily
granted and the gun would have been found in the same spot.

According to the government, Third Circuit precedent
squarely supports its conception of inevitable discovery. The
Court does not find this to be so.

The government begins by correctly noting a divide among the courts of appeals in this area of the law.  Some courts of appeals have adopted an "active pursuit" requirement for invocation of the inevitable discovery doctrine.  These courts apply inevitable discovery only where law enforcement officers were, in fact, "actively pursuing" alternative lawful measures that also would have turned up the evidence uncovered through a constitutional violation.  See, e.g., United States v. Virden, 488 F.3d 1317, 1323 (11th Cir. 2007); United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997).  Another set of courts also deem sufficient "other compelling facts establishing that the disputed evidence inevitably would have been discovered."  United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995); United States v. Boatwright, 822 F.2d 862, 864 (9th Cir. 1987).

Although the cases cited by the government do not explicitly speak to this issue, the government appears to be correct that the Third Circuit falls into the latter category. In Vasquez De Reyes, the Third Circuit stated that a court may presume that lawful, routine conduct would have eventually and inevitably been employed to discover the unlawfully obtained evidence upon a showing that officers engage in such routine conduct "in similar circumstances."  149 F.3d at 195 (citing Kennedy, 61 F.3d 494).  For example, evidence found during an unlawful automobile search may nonetheless be used against the

defendant where the evidence would have been discovered during an inventory search of the vehicle performed as a matter of course following impoundment.  Id. (citation omitted).

From this starting point, the government extrapolates that the inevitable discovery rule may save evidence recovered during a warrantless and unlawful home search where the officers otherwise could have, but did not, obtain a warrant.  That reading of the Third Circuit's decisions is too sweeping.  As an initial matter, and as Mallory rightly identifies, the government has not cited a single case from our court of appeals in which the inevitable discovery doctrine was applied on that set of facts.

The government's reliance on United States v. Stabile, a recent Third Circuit decision to which it analogizes, is misplaced.  In Stabile, the court applied the inevitable discovery doctrine to prevent suppression of evidence uncovered during two searches of computer hard drives already retrieved by state and federal law enforcement.  633 F.3d 219, 245-46 (3d Cir. 2011).  Although the original seizure of the hard drives had been lawful, subsequent searches of the hard drives were made pursuant to defective federal warrants.  Id. at 231-34, 245.  In reaching its conclusion not to suppress, the court reasoned that "the very fact that the Government attempted to secure state and federal search warrants at every step of the search indicates that there

would be little deterrence benefit in punishing the Government"
through the exclusion of evidence.  Id. at 246.  Here, the
officers made no such effort to comply with the Fourth
Amendment's warrant requirement prior to searching behind the
door of Delaine Abu Bakr's home, offering no similar basis for
deviating from the normal remedy of suppression.  The search at
issue in this case also involved a home, where the protective
reach of the Fourth Amendment is strongest.[9]  See Randolph, 547
U.S. at 114 (noting that the home is "the center of the private
lives of our people" (quotation marks and citation omitted)).

Other circuits have refused to apply the inevitable
discovery doctrine on facts that more closely resemble this case.
The Second and Sixth Circuits have denied reliance on inevitable
discovery principles where a home search, initially predicated on
exigent circumstances, was deemed unlawful and, although probable

---

[9] The other facts of Stabile further demonstrate that it
offers an inapt comparison with the case at bar.  In Stabile,
federal agents sought a warrant to search a 120 GB hard drive
belonging to the defendant, but were mistakenly issued a warrant
to search a separate 40 GB hard drive.  633 F.3d at 227-28.
Relying on evidence uncovered during the search of the 40 GB hard
drive, the agents applied for a second warrant to search the 120
GB hard drive, as well as four other of the defendants' hard
drives.  Id. at 228.  The Third Circuit determined that each of
the warrants was invalid, but applied the inevitable discovery
doctrine to prevent suppression.  As it turned out, each of the
40 GB and 120 GB hard drives contained evidence of child
pornography that would have established probable cause to search
the other.  Id. at 245-46.  Regardless of which hard drive was
searched first, the agents' search would have, as it ultimately
did, extend to both hard drives.

cause arguably existed, no warrant was ever obtained.  See United States v. Cabassa, 62 F.3d 470, 473-74 (2d Cir. 1995) (exigencies did not exist to justify search); United States v. Johnson, 22 F.3d 674, 679-80, 683 (6th Cir. 1994) (exigencies had dissipated prior to search).  In Cabassa, the Second Circuit suppressed evidence obtained during a warrantless apartment search, despite crediting the searching officer's "good faith belief in the existence of exigent circumstances" and the fact that other law enforcement officials were in the process of applying for a warrant when the search began.  62 F.3d at 473 & n.2.  For several reasons, including the officers' decision to abandon the warrant application, the court determined that effectuation of a warrant-based search was not an inevitability.  Id. at 473-74.

In these and other cases, courts have rejected application of the inevitable discovery doctrine merely because the officers had demonstrated that a warrant could have issued. The reason is clear.  "[T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause."  Johnson, 22 F.3d at 683.  Indeed, the government's approach—that the inevitable discovery doctrine can validate the use of evidence seized whenever officers could have secured a warrant, but failed to do so—would eviscerate the warrant

requirement, which lies at the heart of the Fourth Amendment. United States v. Reilly, 224 F.3d 986, 995 (9th Cir. 2000); United States v. Allen, 159 F.3d 832, 841-42 (4th Cir. 1998). It would, as a practical matter, elevate probable cause as the sole constitutional standard governing searches, including those within private homes. This would contravene the bedrock principle of Fourth Amendment jurisprudence that "searches and seizures inside a home without a warrant are presumptively unreasonable." See King, 131 S. Ct. at 1856 (quotation marks and citation omitted).

Several cases, including the Ninth Circuit's decision in United States v. Boatwright, which the government cites, note the danger of applying the inevitable discovery doctrine in this manner. In addition to undermining key aspects of Fourth Amendment doctrine, it creates significant opportunity for abuse by law enforcement. An officer, armed with probable cause, could easily ignore his obligation to procure a warrant from a neutral and detached magistrate, conduct an unlawful search and seizure of evidence, and later testify that he would have obtained a warrant and seized the very same evidence, in any event. See Boatwright, 822 F.2d at 865; United States v. Richardson, No. 06-cr-31, 2007 WL 2823336, at *3 (W.D. Pa. Sept. 26, 2007).

Moreover, officer testimony that a warrant could have been obtained, though none was secured, appears to involve the

sort of speculative, unverifiable facts insufficient to trigger the doctrine's protection.  See Vasquez De Reyes, 149 F.3d at 195 (citing Nix, 467 U.S. at 444 n.5).  The fact that obtaining a warrant depends upon tailored applications and a magistrate's individualized probable cause assessment, rather than routine, standardized conduct, suggests that expected issuance of a warrant is a particularly ill-suited basis for invoking the inevitable discovery doctrine.

The Court is mindful that one reading of the government's position does find some support in the case law.  It is possible, although not altogether clear from its briefing, that the government argues in favor of a heightened test for inevitable discovery in warrantless search cases, i.e., applying the inevitable discovery doctrine only when it is certain, and not just more likely than not, that a warrant would have issued. The Seventh Circuit, in a case cited by the government, has adopted such a standard.  In United States v. Are, it determined that evidence obtained during a warrantless home search may still be admissible where it is reasonable to conclude that officers would have sought a warrant and that one "certainly" would have issued.  590 F.3d 499, 507 (7th Cir. 2009) (quotation marks and citation omitted).

To the extent the government argues that standard is or should be controlling, the Court disagrees.  For one thing, the

government overstates the broad consensus behind this approach when it calls it the "majority" view to which the Third Circuit has ascribed. Gov't's Supp. Br. at 16, 19. The Court is unaware of any other circuit adopting the Seventh Circuit's formulation, and the government directs its attention to none. Additionally, the Seventh Circuit's test still runs into the same theoretical objections outlined above. The <u>Are</u> standard may require certainty that a warrant would issue, but it requires certainty only as to the existence of probable cause. Under the Seventh Circuit's formulation, the fact that probable cause existed at the time of the search, standing alone, would still be sufficient to sanction a warrantless home search. As several courts of appeals have reasoned, evolution of the doctrine toward that end does great damage to the Fourth Amendment's warrant requirement. <u>See</u> <u>Reilly</u>, 224 F.3d at 995; <u>Allen</u>, 159 F.3d at 841-42; <u>Johnson</u>, 22 F.3d at 683.

Invocation of the inevitable discovery doctrine is not merited on the facts of this case.


III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant Mallory's motion to suppress. An appropriate order issues separately.